2021 IL App (1st) 181158-U

No. 1-18-1158

Order filed March 23, 2021

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

---

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

---

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 13 CR 5219 |
| | ) | |
| MAXIMINO ROMAN-CASTANEDA, | ) | Honorable |
| | ) | Geary W. Kull, |
| Defendant-Appellant. | ) | Judge, presiding. |

---

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court.
Justice Lavin concurred in the judgment.
Justice Pucinski specially concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The court did not fail to conduct a preliminary inquiry into defendant's *pro se* posttrial claim of ineffective assistance of counsel.

¶ 2    Following a jury trial, defendant Maximino Roman-Castaneda was convicted of four counts of predatory criminal sexual assault (720 ILCS 5/12-14.1(a)(1) (West 2004)) and sentenced to four consecutive terms of 20 years' imprisonment. On appeal, defendant argues that the trial

court erred in failing to conduct a preliminary inquiry into his *pro se* posttrial ineffective assistance of counsel claim, pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984). We affirm.

¶ 3    Defendant was charged by indictment with four counts of predatory criminal sexual assault of Y.S. occurring between 2004 and 2011, when Y.S. was younger than 13 and defendant was 17 or older (720 ILCS 5/12-14.1(a)(1) (West 2004)). The indictment alleged contact between defendant's mouth and Y.S.'s vagina (count I), and his penis and her vagina (count II), mouth (count III), and anus (count IV).

¶ 4    Defendant was appointed an assistant public defender (APD) and was assisted by a Spanish interpreter at each proceeding.

¶ 5    During pretrial litigation, the trial court denied defendant's motion to suppress statements and heard argument on the State's motion to allow other-crimes evidence involving five other victims. At the hearing on the State's motion, defendant requested a new attorney based on the APD's performance in connection with the motion to suppress. The court advised defendant that it would address complaints about his representation at the end of the case.

¶ 6    On the next date, the court granted the State's motion as to four other-crimes victims. The APD then informed the court that defendant wished to represent himself. The court asked defendant why he was unhappy with the APD, and defendant again complained about counsel's performance at the suppression hearing. The court urged defendant not to represent himself, but he insisted on proceeding *pro se* and the court gave the APD leave to withdraw.

¶ 7    At subsequent proceedings, the court suggested defendant accept the APD's reappointment, but defendant variously stated that he and his previous attorney did not communicate well, she did not look after his interests, she did not review a statement he wanted to

use at the suppression hearing or allege certain facts, and she unsuccessfully litigated the pretrial motions. Shortly before trial, defendant accepted the appointment of two new APDs.

¶ 8    During later proceedings, defendant stated that he did not wish to be represented by the assisting APD because that attorney had assisted defendant's first attorney in litigating the motion to suppress. Defendant again complained about his first APD's performance in connection with the suppression motion and about his new attorneys' performance regarding discovery. The court granted the new APDs leave to withdraw, but ultimately reappointed the lead APD.

¶ 9    On the date of trial, the new APD, now assisted by a different attorney, filed a motion to withdraw, explaining that facts existed which made it impossible for them to effectively represent defendant. Defendant requested a different attorney, stated he did not wish to represent himself, and asserted that he informed counsel about irregularities in discovery. The court denied counsels' motion to withdraw and stated it had never seen any indication that the public defender's office had not represented defendant professionally and appropriately.

¶ 10    Defendant then filed a *pro se* motion alleging ineffective assistance of counsel. The motion was written in Spanish and an interpreter read it aloud in court. Defendant alleged that (1) the new APDs did not pursue defendant's claims regarding discovery and intimidated him from alerting the judge; (2) the court refused to appoint a different attorney and intimidated him into accepting appointed counsel; (3) the assisting APD disregarded his complaints about the lead APD; and (4) counsel had not requested he be examined for impotence. The trial court responded to defendant's complaints, queried his attorneys, and concluded that defendant was "represented by competent attorneys" who "can determine what is appropriate and what is not appropriate." The cause then proceeded to trial.

¶ 11   At trial, Y.S. testified that she was born in 1999. Y.S. grew up in Cicero, with her parents, two older sisters, and two younger brothers. Y.S. often spent time at her cousins' home nearby. Defendant, whom Y.S. identified in court, was a close friend of Y.S.'s parents and rented a room in the basement of Y.S.'s cousins' home. Y.S. saw defendant often, and defendant gave her and the other children movies, candy, and pizza. When Y.S. was in kindergarten, she moved to Melrose Park, but visited her family in Cicero at the home where defendant lived.

¶ 12   Once, around the time she was in kindergarten, Y.S. was playing with a ball outside the home where defendant lived. The ball entered the open door to the house and went downstairs. Y.S. entered the basement looking for the ball, and saw defendant standing outside the open door to his room. Defendant told her the ball was on his bed. Y.S. entered his room to retrieve the ball and defendant closed and locked the door. Defendant pushed her on the bed, pulled her skirt down, and removed her underwear. Defendant exposed his penis, climbed on the bed, and kissed and licked Y.S.'s ear. Defendant put a cream on his penis and inserted it into her vagina. Y.S. told him it hurt, but defendant did not stop and told her not to make noise. Y.S. did not scream because she was scared. Afterwards, defendant told her not to tell anyone because no one would believe her.

¶ 13   When Y.S. was in first grade, she returned home from school one day and defendant was sitting on the couch. No one else was home. Y.S. entered her bedroom, removed her backpack, turned, and saw defendant standing at the door. Defendant pushed her on the bed, lowered his pants and underwear, and removed her pants and underwear. Defendant told her not to make noise. Defendant kissed Y.S.'s ear, face, and vagina, and then put Vaseline on his penis and inserted it in her vagina. Y.S. said that it hurt, but defendant did not stop. Before defendant let her leave the

bedroom, he told Y.S. not to tell anyone because he could disconnect the oxygen tank used by Y.S.'s baby brother.

¶ 14    When Y.S. was in approximately third grade, she and one of her brothers were alone in their house with defendant. He gave her brother pizza, candy, and movies in the living room. Y.S. was in her bedroom, which defendant entered. Y.S. told him to leave, but defendant stated "that it was going to be quick," and instructed her to stand next to him. Y.S. complied. Defendant lowered Y.S.'s pants and underwear, laid her on the lower bunk bed, and kissed her ear. Defendant flipped Y.S. onto her stomach, with her legs on the floor, and kissed her ears. Defendant put cream in her anus with his finger and then penetrated her anus with his penis. Y.S. tried not to scream so as to not frighten her brother, and told defendant he was hurting her. Y.S. squirmed, and defendant grew angry, stopped, and told her to dress. Defendant told Y.S. not to tell anyone what he had done, and Y.S. went to the bathroom and saw blood when she cleaned herself. Another time, when Y.S. was in middle school, defendant entered her room and told her he would put his penis in her anus, but Y.S. raised her voice, told him to leave, and defendant did.

¶ 15    When Y.S. was in sixth grade, she stayed home sick from school one day. Defendant arrived at her home with pizza but told her she could not eat any. Y.S. entered her bedroom and closed and locked the door with a turn lock which defendant was able to open. Y.S. was laying on the bottom bunk. Defendant told Y.S. he could cure her strep throat, but Y.S. said no. Defendant grabbed her feet and pulled her towards him until her feet were on the floor and she was seated on the edge of the bed. Defendant exposed his penis and told her to put it in her mouth. When Y.S. did not, defendant opened her mouth with one hand, and with his other hand put his penis in her mouth. Y.S. squirmed and eventually bit defendant's penis, and defendant stopped. Defendant put

his penis in Y.S.'s mouth on one other occasion. Another time, when defendant was driving with Y.S. in the passenger seat and her sisters in the backseat, defendant dug his fingers towards her vagina over her pants, but Y.S. pushed his hand off and he stopped.

¶ 16    Y.S. stated that defendant put his penis in her vagina and his mouth on her vagina many times, beginning when she was five years old. Defendant ceased visiting her home when Y.S. was 13. Y.S. never told anyone because she feared no one would believe her. Y.S.'s sister M.S. told her once that defendant had hurt M.S. and M.S. told their mother, but their mother did not believe her. Y.S. did not tell M.S. that defendant had done anything to her. Y.S. confirmed that she first told someone about what defendant had done to her in February 2013.

¶ 17    On cross-examination, Y.S. testified that she saw doctors before she started school but did not tell them what defendant did. Y.S. never told her cousins in Cicero about defendant's assaults. Only once did Y.S. notice blood after defendant assaulted her. Y.S.'s family never commented on defendant's presence in her bedroom even though her siblings were sometimes present when he visited the house.

¶ 18    Y.S. eventually spoke with officers at the police station but did not remember whether the conversation was videotaped. She informed the officers that defendant threatened her brother's oxygen tank. Y.S. did not know how it was defendant would be in her home when she returned from school. On redirect examination, Y.S. testified that, sometimes, defendant would leave her house before her parents arrived, and then return and pretend he had not been there earlier.

¶ 19    M.S., Y.S.'s older sister, and S.S., Y.S.'s cousin, testified as other-crimes witnesses. The court instructed the jury that their testimony could be considered only for the limited purpose of the defendant's propensity to commit sexual assault.

¶ 20    M.S. testified that when the family lived in Cicero, defendant, whom M.S. identified in court, would bring the children candy, food, and movies. M.S. detailed several incidents that occurred the summer she was eight years old, while they still lived in Cicero, which made her uncomfortable with defendant. First, defendant tickled her vagina over her underwear. Second, she was playing with her cousins and a ball rolled into the basement near defendant's door. M.S. chased the ball, and found defendant holding it. Defendant told her that if she wanted the ball she would have to give him something in return, and M.S. walked away. Third, near the end of that summer, defendant offered candy to everyone but M.S., who then went to his room to ask for candy. Defendant told her to get the candy from the bed and pushed her on the bed. Defendant put his hand up her shirt, touched her chest, and tried to lower her skirt but could not. M.S. heard her cousins outside and defendant pushed her from the room and tossed the candy on the floor. Defendant then stood near the door with his finger on his lips to tell M.S. to be quiet. Fourth, on multiple instances, defendant placed candy outside the window to his bedroom, which was just above the sidewalk. Through the window, M.S. saw defendant play with his penis.

¶ 21    When M.S.'s family moved to Melrose Park while M.S. was in third grade, defendant sometimes visited when M.S. was home alone. A neighbor oversaw the children but would stay inside her own apartment. Defendant sometimes grabbed M.S.'s butt, tried to kiss her, kissed her on the neck, and told her she was good-looking and looked "fresh."

¶ 22    When M.S. was a freshman in high school, she saw defendant at the bus stop after school, and he told her that her mother had sent him to pick her up. Defendant took her home, and she began to wash dishes when defendant pressed his erect penis against her from behind. M.S. tried to push him off, but defendant grabbed her and kissed her behind her ear. While M.S. attempted

to hang onto a wall, defendant dragged her into her bedroom, closed the door and locked it, and pushed her facedown on the bed. Defendant lowered his pants, put something oily around his penis, held her head down, and put his penis in her anus. M.S. told defendant to stop but he did not. Afterwards, he told her not to say anything because he would tell her parents she lied. M.S. showered and noticed blood. This happened multiple times, until M.S. was a sophomore in high school.

¶ 23    While M.S. was still a freshman, she told her mother that she did not want defendant to visit but did not tell her why. Her mother responded that M.S. probably did not want defendant to visit because he was strict, which made M.S. feel as if her mother would not do anything. M.S. told Y.S. about their mother's response. Y.S. did not tell M.S. that she was also uncomfortable with defendant. Defendant ceased visiting when M.S. was a sophomore. In February 2013, M.S. went to the police station and told officers what defendant had done.

¶ 24    On cross-examination, M.S. testified that her mother did her laundry and M.S. told her that blood in M.S.'s laundry was poop. M.S. did not tell the doctors she saw for school physicals about the incidents.

¶ 25    S.S. testified that she lived in the Cicero house where defendant rented a room. S.S. identified defendant in court. One day, when S.S. was in third or fourth grade, defendant picked her up from school, which he had never done before. Defendant parked three blocks from the home and told S.S. he had a toy for her in his room. S.S. entered his room to retrieve the toy, and defendant closed and locked the door and asked her to lower her pants. When S.S. did not, defendant lowered her pants and underwear. Defendant told S.S. to lay down on the bed and S.S.

complied. Defendant put baby oil on his exposed penis and inserted it into S.S.'s vagina. After defendant dressed, he told S.S. not to say anything because it was her fault for wanting the toy.

¶ 26     About a week later, defendant again picked up S.S. from school, took her home, and told her he had a new toy and candies in his bedroom. There, he lowered her pants and underwear, told her to kneel on the bed, put baby oil and a condom on his penis, and inserted his penis into her vagina. Afterwards, he told S.S. not to tell anyone, that he would hurt her family, and that no one would believe her because she wanted the toys and candies. Once, defendant told her that he had recorded the assault. A similar event occurred about two weeks after the second incident. After the third incident, S.S. never again went into defendant's bedroom, even though he tried to pick her up from school and told her he had toys, candies, and movies in his room. Defendant lived in the home until 2012. In February 2013, S.S. went to the police station and told officers what happened.

¶ 27     On cross-examination, S.S. testified that she never told the doctors she saw for school physicals what happened. During the assaults, S.S.'s mother was in the home. S.S. never saw defendant operate a camera.

¶ 28     Cicero police officer Manuel Velazquez testified that, on February 9, 2013, he met defendant, whom he identified in court, in an interview room at the police station. An assistant State's Attorney (ASA) and another detective were also present, and Velazquez translated between Spanish and English while the ASA asked defendant questions. The ASA typed and printed a statement regarding Y.S., which Velazquez translated for defendant and identified in court. Velazquez translated the statement page-by-page, and defendant initialed each page to signify no changes were required. Defendant also signed near a portion that listed his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). Velazquez identified similar statements regarding M.S. and S.S.

¶ 29    On cross-examination, Velazquez stated that he translated each of the three statements for defendant. Velazquez would read one portion, then defendant would sign the page. Velazquez's translation was not recorded.

¶ 30    ASA Anna Sedelmaier testified that, on February 8, 2013, she interviewed Y.S., M.S., and S.S. at the Cicero Police Department. She then interviewed defendant, whom she identified in court. Defendant was already in custody. A detective was also present for the interview, whom Sedelmaier relied on for translation. Sedelmaier Mirandized defendant and he agreed to speak. Defendant was extremely responsive and very verbal. After the initial interview, Sedelmaier asked defendant if he would give a written statement and defendant agreed. Velazquez assisted in translating the written statement. Sedelmaier prepared statements regarding Y.S., M.S., and S.S., all of which defendant signed. Sedelmaier identified the statements in court. The statements were admitted into evidence and published to the jury. Sedelmaier read the statements aloud.

¶ 31    Defendant stated that he began fondling Y.S. when she was 9 or 10 years old. The first assault occurred when he, Y.S., and M.S. were at Y.S.'s home. Defendant fondled Y.S., grabbed her vagina, and asked M.S. for permission to take Y.S. into the bedroom. M.S. agreed. In the bedroom, defendant asked Y.S. for anal sex and she agreed. Defendant repeated the same conduct twice a month for approximately 2½ years, and never penetrated Y.S.'s vagina because he did not want to take her virginity. Defendant said that people rape children because prostitution is prohibited.

¶ 32    Defendant further stated that when M.S. was in her first year of high school, he picked her up from school, took her home, and his penis became erect while she washed dishes. Defendant kissed her neck and rubbed her breasts. Two months prior, defendant had entered M.S.'s bedroom,

asked for sex, and assumed it was okay when she did not respond. Defendant lowered her pants and underwear, put Vaseline on his penis, and penetrated M.S.'s anus. Defendant recalled a similar incident about one month later and could not remember if there was a third instance. Defendant never penetrated M.S.'s vagina. Defendant also told M.S. he wanted to have sex with Y.S., and suggested M.S. occupy their brothers so he could be alone with Y.S. Defendant saw M.S. without having sexual contact until 2011, when her mother told him to stop touching her and not to visit their home.

¶ 33    Defendant further stated that, when S.S. was 9 or 10, he picked her up from school, took her home, and asked her to enter his room. Defendant removed his and S.S.'s pants, and S.S. hid under a blanket. Defendant attempted to have anal sex with S.S. but S.S. insisted on vaginal sex, which did not interest him because he was not attracted to her. Defendant placed his penis against her vagina but could not penetrate her because he was not fully erect, so he lost interest and got off her. S.S. was angry at defendant and never really spoke to him again.

¶ 34    On cross-examination, Sedelmaier stated she did not remember how long she spoke with Y.S. at the police station, but thought that the conversations with Y.S., M.S., and S.S. each lasted at least an hour. Sedelmaier did not take notes. Defendant was the last person with whom she spoke. The interview of defendant lasted multiple hours. Sedelmaier did not speak Spanish, and did not know for certain whether Velazquez accurately translated the written statement for defendant.

¶ 35    After the State rested and the court denied the defense's motion for a directed verdict, one of defendant's attorneys advised the court that they spoke with defendant and he did not wish to testify. The court admonished defendant that he had the right to testify and asked whether he

wanted to testify. Defendant responded that he did not. Next, the court asked whether defendant made that decision "of your own free will." The following colloquy occurred:

> "THE DEFENDANT: I'd like to explain the reasons, [Y]our Honor. But you just give me the option to say yes or no.
>
> THE COURT: Well, the question is, did you decide not to testify of your own free will? That's really the only issue here. You have a right to testify or not to testify.
>
> THE DEFENDANT: No, [Y]our Honor.
>
> THE COURT: And if nobody has forced you to make that decision, that's all that is relevant to me at this point.
>
> That wasn't a question. That was not a question. All right. Have a seat."

¶ 36 The defense rested, and following closing arguments, the jury found defendant guilty on all counts.

¶ 37 Defense counsels filed a motion and amended motion for a new trial, arguing, *inter alia*, that the court erred in refusing to appoint a private attorney when defendant had "fired" the public defender's office prior to trial, communication between counsel and defendant had collapsed and effective representation was impossible, and the court only gave defendant the option of representing himself or being represented by the public defender's office. At a hearing, defense counsels specified that effective representation of defendant was impossible because defendant refused to cooperate or communicate. The court found that defendant's refusal to cooperate was volitional and that his repeated requests to change lawyers were dilatory. The court denied the motion.

¶ 38    At sentencing, the State called M.S. to testify in aggravation. M.S. again detailed the incidents she described at trial. Y.S. read a victim impact statement explaining that defendant hurt her, her parents, and her family, and took advantage of her family's trust.

¶ 39    The court asked defendant's attorneys whether they had "anything to present in mitigation." One stated that defendant wished to speak in mitigation "against advice of counsel." The court swore defendant, who then complained that the police did not send him to a medical examination and began to talk about the prosecutor.

¶ 40    The court interrupted defendant and noted that he had an opportunity to testify at trial and declined, and instructed defendant to limit his statement to factors in mitigation. Defendant replied that he did not want to testify because his attorneys "were not prepared" for it. The court reiterated that it had asked defendant whether his decision not to testify was his own, and noted that defense counsels were prepared throughout trial and defendant chose not to cooperate with them. The court then asked counsels if they were prepared to present defendant as a witness at trial if he chose to testify. One of the APDs responded:

> "Judge, not only is that true, we did discuss it with him ad nauseam about testifying, and he did not want to testify. And I do believe the Court questioned him, and he said he did not want to testify. So we were ready to present him as a witness."

¶ 41    Defendant again complained about the State's handling of the case, and the court again interrupted to instruct him to limit himself to factors in mitigation, repeating that he gave up his right to testify. Defendant responded: "That's the reason why I want—I wanted to have other attorneys. I'm not going to say anything. I'm going to continue this process with the Illinois supreme court." The court asked defendant if he wanted to say anything about his character,

upbringing, or anything he had done in the community that would make the court consider a lesser sentence, and defendant stated, "I guess the lies and lies—everything that I can say is not going to help me at all."

¶ 42    Following arguments in aggravation and mitigation, the court explained to defendant his right of allocution, where, unlike when he spoke in mitigation, defendant would not be limited in what he could say. The following colloquy then occurred:

> "THE DEFENDANT: Facing so much injustice and lies, there's nothing to talk about.
>
> THE COURT: Understand, I'm not limiting what you have to say now. Do you understand that, or do you want to say something?
>
> THE DEFENDANT: I just want to say the same thing, [Y]our Honor. In my process since [the prosecutor] took the case I already have two attorneys. Unfortunately I analyze that they did not help me. I asked you to change because she was ineffective assistance."

Defendant continued that the prosecutor lied and failed to investigate the case, and concluded by thanking the court for allowing him to speak.

¶ 43    The court announced that it had considered the factors in aggravation and mitigation, listened to M.S.'s and Y.S.'s testimony, read defendant's presentence investigation report, and listened to the arguments. The court sentenced defendant to consecutive 20-year terms of imprisonment on each count. Defendant's motion to reconsider sentence was denied.

¶ 44    On appeal, defendant argues that his statement in allocution triggered the trial court's duty to perform a preliminary *Krankel* inquiry into the factual basis of his ineffective assistance of counsel claim. The State contends that, because the court inquired into defendant's earlier

complaint in the sentencing hearing, and defendant stated in allocution that he wanted "to say the same thing," the court did not need to conduct another inquiry.

¶ 45    Under *Krankel*, when a defendant raises a *pro se* posttrial ineffective assistance of counsel claim, the trial court determines whether to appoint independent counsel to argue the claim. *People v. Ayres*, 2017 IL 120071, ¶ 11. A *pro se* defendant need only bring his claim to the trial court's attention, and may do so orally or in writing. *Id.* The trial court need not automatically appoint new counsel, but must conduct some type of inquiry into the factual basis underlying the defendant's claim, if any. *Id.* If, after learning the claim's factual basis, "the trial court determines that the claim lacks merit or pertains only to matters of trial strategy, then the court need not appoint new counsel and may deny the *pro se* motion." (Internal quotation marks omitted.) *Id.* The trial court should appoint new counsel if the *pro se* defendant's allegations show possible neglect of the case. *Id.*

¶ 46    The goal of the proceedings is to facilitate the trial court's full consideration of the claim, thereby potentially limiting issues on appeal. *Id.* ¶ 13. The inquiry creates a necessary record while the facts and circumstances are clear in the minds of all involved. *Id.* ¶ 21. In making the inquiry into the defendant's claims, the trial court may (1) inquire of trial counsel about the defendant's allegations; (2) discuss the allegations with the defendant; or (3) make a determination based on its own knowledge of counsel's performance at trial and the allegations' insufficiency. *Id.* ¶ 12.

¶ 47    The reviewing court's operative concern is whether the trial court adequately inquired into the defendant's *pro se* allegations (*id.* ¶ 13), an issue reviewed *de novo* (*People v. Jolly*, 2014 IL 117142, ¶ 28).

¶ 48    Here, during the mitigation phase of the sentencing hearing, defendant stated that he did not testify at trial because his attorneys were unprepared to call him. The court replied that his attorneys were prepared throughout trial, and asked whether they were prepared to present defendant as a witness, which they confirmed. Defendant then complained of the prosecution's handling of the case, and when the court noted that it was only appropriate at that time for him to speak in mitigation and he had waived his right to testify, defendant replied that was why he wanted different attorneys. Later, the court offered defendant the opportunity to speak in allocution and advised that it would not limit what defendant could say. Defendant stated: "I just want to say the same thing, [Y]our Honor. In my process since [the prosecutor] took the case I already have two attorneys. Unfortunately I analyze that they did not help me. I asked you to change because she was ineffective assistance." The remainder of defendant's statement in allocution related only to the State's handling of the case.

¶ 49    The record, taken in context and read as whole, reflects that the statement defendant made in allocution was not a new claim of ineffective assistance. When defendant stated in allocution that he "just want[ed] to say the same thing," namely, that he wanted different attorneys because they provided ineffective assistance of counsel, the court was entitled to base its evaluation of that claim on its own knowledge of the proceedings, defense counsels' performance, and the sufficiency of the allegations. *Ayres*, 2017 IL 120071, ¶ 12. Just moments earlier, the court conducted a proper inquiry into defendant's repeated assertion that counsel was unprepared for him to testify. By advising defendant prior to defendant's statement that he would not be limited in what he could say, the court here " 'afforded the defendant the opportunity to specify and support his complaints,' " (*People v. Moore*, 207 Ill. 2d 68, 80 (2003) (quoting *People v. Robinson*,

157 Ill. 2d 68, 86 (1993)), and defendant's choice to recall what he had said previously and then complain about the State's handling of the case indicates that he had no other issues with his representation he wished to discuss with the court.

¶ 50    Defendant compares his case to *People v. Remsik-Miller*, 2012 IL App (2d) 100921. There, after the defendant was found guilty of solicitation of murder for hire, she filed a *pro se* posttrial motion asking for a new trial based on new evidence or witnesses who were not known or available at the time of trial. *Remsik-Miller*, 2012 IL App (2d) 100921, ¶ 4. At a hearing, the defendant listed those witnesses and stated that they could have testified to her state of mind, and the motion was denied. *Id.* Following sentencing, the defendant filed a *pro se* motion for reconsideration of sentence and, at a hearing, stated that she did not believe defense counsel represented her "to his fullest ability" during trial. *Id.* ¶ 5. The court did not perform any preliminary inquiry and denied her motion for reconsideration. *Id.* On appeal, the State argued that the court was not required to inquire following the defendant's statement because it related back to the argument raised in her *pro se* posttrial motion. *Id.* ¶ 8. The appellate court rejected that argument because the defendant's *pro se* posttrial motion requested a new trial and did not allege ineffective assistance of counsel. *Id.* ¶ 10. Here, on the other hand, defendant's statement in allocution directly related to the allegation he raised earlier at the same hearing, and in fact, he asserted it was "the same thing."

¶ 51    Defendant argues that we cannot assume he meant to communicate that he had no additional complaints to raise. No assumption of that kind is required, however, because, although defendant was assisted by an interpreter throughout the proceedings, he explicitly stated that he wanted to raise the same claim about his attorneys' performance that he already raised twice before during the same proceeding, and then proceeded to discuss other matters unrelated to counsel's

performance. Moreover, given that the court performed a detailed inquiry into defendant's pretrial motion alleging ineffective assistance of counsel, the court was aware when defendant raised his claim at the sentencing hearing that his allegations about his attorneys' alleged unpreparedness to call him at trial differed from those complaints raised pretrial and that defendant had not said anything that suggested he was renewing his pretrial complaints. Consequently, we conclude that the court did not err in failing to conduct a preliminary inquiry into the *pro se* allegation of ineffective assistance of counsel defendant raised while speaking in allocution.

¶ 52    For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 53    Affirmed.

¶ 54    J. Pucinski specially concurring.

¶ 55     I agree with the result of the majority.

¶ 56     However, I write to express my continuing concern over the Chicago Police Department's use of investigating officers to translate between a suspect and the state's attorney when the suspect is non-English speaking.

¶ 57     The process of the investigation officer doing the translating must at least raise a question of fairness where the investigating officer has already had access to various elements of the investigation, including the witnesses.  This could lead, however, subtly, to translations that support the investigating officer's belief that the suspect is guilty.

¶ 58     In addition the school child game of "post office" comes to mind but with an alarming wrinkle: when children play this game they are normally speaking the same language, and the "reveal" at the end is when the first child repeats what he or she actually said, and then all the children compare it to what the last person heard.

¶ 59    Here there was no "reveal." The state's attorney asks a question in English, the investigating officer translates it into Spanish to the suspect. There is no guarantee that the translation is correct or idiomatically consistent with the original English question. The suspect cannot challenge it because he cannot understand the English question to begin with. Then the suspect answers in Spanish and the investigating officer translates that into English for the state's attorney, but again, the Spanish speaking suspect cannot correct or even understand what the state's attorney is hearing. This repeats until a statement is written in English by the state's attorney and translated orally by the investigating officer. Again, the suspect cannot challenge or even correct mistakes made. It makes little difference whether any mistakes made by the investigating officer are innocent or the result of the investigating officer's belief that they have the right guy and can mold the process to fit the crime.

¶ 60    I believe that the better practice would be for the Chicago Police Department to assign an officer other than the investigating officer to do the translating, and that it should video record all such interactions with non-English speaking suspects. This would at the very least allow the attorney for the defense to review the translations to assure accuracy. Since video equipment is now required in all homicide investigations the equipment is available and would not require additional spending in other cases.